# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

Case No.  HG 10-13202

RICHARD J. SUTTON,

Debtor.

_____/

JEFF A. MOYER, Trustee,

Plaintiff,

vs.

Adv. Pro. No.  11-80269

MARK A. KOLOSEIK,

Defendant.

_____/

## OPINION RE: TRUSTEE'S SEPTEMBER 2, 2011 MOTION - DEFAULT JUDGMENT

Jeff Moyer ("Trustee") has asked that a default judgment be entered against Mark Koloseik,

the defendant in this adversary proceeding.  The question is whether this court has the constitutional

authority to do so.

## BACKGROUND

Trustee has sued many persons to recover amounts due on open account.[1]  Koloseik is among

those defendants who did not file an answer.[2]  Accordingly, Trustee asked that a default judgment

---

[1]Apparently, Debtor was in the business of selling tools and had extended credit to his customers.

[2]*See also Moyer v. Griffin (In re Sutton)*, No. 11-80270 (Bankr. W.D. Mich. June 3, 2011); *Moyer v. Shay (In re Sutton)*, No. 11-80271 (Bankr. W.D. Mich. June 3, 2011); *Moyer v. Johnson (In re Sutton)*, No. 11-80272 (Bankr. W.D. Mich. June 3, 2011); *Moyer v. Steeby (In re Sutton)*, No. 11-80275 (Bankr. W.D. Mich. June 3, 2011); *Moyer v. Maccrossen (In re Sutton)*, No. 11-80276 (Bankr. W.D. Mich. June 3, 2011); *Moyer v. Purucker (In re Sutton)*, No. 11-80277 (Bankr. W.D. Mich. June 3, 2011); *Moyer v. Garrett (In re Sutton)*, No. 11-80279 (Bankr. W.D. Mich. June 6, 2011); *Moyer v. Stuckey (In re Sutton)*, No. 11-80283 (Bankr. W.D. Mich. June 8, 2011); *Moyer v. Livingston (In re Sutton)*, No. 11-80284 (Bankr. W.D. Mich. June 8, 2011).

enter in the amount of $1,850.59. The court in turn scheduled a hearing to give Koloseik a final opportunity to have the default set aside. The notice also advised Trustee that the court intended to discuss with him whether it had the constitutional authority to enter the requested relief.

Koloseik did not appear. As for the court's authority, Trustee disagreed with the preliminary determination that a final judgment[3] could not enter and that a report and recommendation[4] would have to be made instead. Therefore, Trustee was given an opportunity to both brief the issue and to offer additional argument at a second hearing.

## TRUSTEE'S ARGUMENT

*Stern v. Marshall*[5] is the Supreme Court's most recent decision regarding a bankruptcy judge's authority. However, *Northern Pipeline*,[6] a much earlier decision, had already held that bankruptcy courts were constitutionally incapable of entering a judgment when only a contract claim against a non-creditor was involved. Therefore, this court had not anticipated much resistance from Trustee when it raised *Northern Pipeline* as a reason for not entering a final judgment. If anything, *Stern* seemed to confirm what that case had previously decided.

---

[3]For purposes of this opinion, a "judgment" or "final judgment" means a judgment or other order entered by this court that would be appealable to either the district court or a bankruptcy appellate panel pursuant to 28 U.S.C. § 158.

[4]A report and recommendation is the alternative 28 U.S.C. § 157 offers for bankruptcy court decisions involving so-called non-core matters. It permits the bankruptcy judge to make recommended findings of fact and law to the district court for its own de novo review. *Cf.* 28 U.S.C. § 157(c).

[5]*Stern v. Marshall,* ____ U.S. ____, 131 S. Ct. 2594 (2011).

[6]*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S. Ct. 2858 (1982).

However, in preparing his complaint, Trustee was careful not to include an actual contract claim. He instead seeks recovery under Section 542(b).[7]

> [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee . . . .

Trustee argues that pleading his case in this fashion distinguishes it from *Northern Pipeline*. He points out that the matter there involved only state law claims that the debtor could have pursued just as easily prepetition. On the other hand, this action is based upon what Trustee contends is a power created solely under the bankruptcy laws to enable him to marshal the estate's property, including the debt Koloseik owes.[8]

As for *Stern*, Trustee actually relies on it to reinforce his contention that the Court has carved out only a very small part of what otherwise is still a robust list of activities that fall within this court's core authority.[9] Trustee relies particularly upon Chief Justice Roberts' own comment

---

[7] 11 U.S.C. § 542(b). Unless otherwise designated, all further references to "Section ____," "Bankruptcy Code," or "Code" shall be to the Bankruptcy Code as currently amended. 11 U.S.C. §§ 101, *et seq.*

[8] Trustee's gambit does raise the question of whether he has pled enough to warrant a judgment at all. However, the court is satisfied that Trustee's complaint, although pled as a Section 542 turnover action, was sufficient to put Koloseik on notice that the estate was attempting to collect money contractually owed by him to the debtor. Moreover, Trustee's complaint includes a second count for quantum meruit.

[9] Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

28 U.S.C. § 157(b)(1).

3

concerning the practical significance of what he and the other three justices joining him characterized as only a narrow ruling.

> We do not think the removal of counterclaims . . . from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United State that the question presented here is a "narrow" one.

*Stern*, 131 S. Ct. at 2620.

The inference that Trustee of course wants to draw is that a bankruptcy court's oversight of the estate's assets, including its accounts receivable, has to be among the many allocated tasks that the Chief Justice implied are still constitutionally sound. *Cf.* 28 U.S.C. §§ 157(b)(2)(A) and (O) ("Core proceedings include . . . matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate . . . .").

## DISCUSSION

Other opinions have already provided the details in *Stern*.[10] In short, a bankruptcy court had awarded Vicki Marshal, as debtor-in-possession, a substantial judgment against Pierce Marshal, her stepson, on account of what was clearly a state law claim – tortious interference. However, unlike the plaintiff in *Northern Pipeline*, Vicki had not simply sued Pierce as a non-creditor defendant. Rather, she had made a counterclaim as part of her overall objection to the proof of claim that Pierce himself had filed. *Cf.* FED. R. BANKR. P. 3007(b). Therefore, when Pierce later questioned the judgment's validity, Vicki argued that the bankruptcy court had acted appropriately notwithstanding the nature of her claim because its core authority included even after *Northern Pipeline* all "counterclaims . . . against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

---

[10]*See, e.g., In re Safety Harbor Resort & Spa*, 456 B.R. 703, 707-14 (Bankr. M.D. Fla. 2011).

The Supreme Court, however, did not agree, finding that Vicki had still pled the type of common law claim that "we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court." *Stern*, 131 S. Ct. at 2616. But Justice Roberts, in writing for the Court, was also careful to limit the ruling to only the "isolated" issue addressed.

> We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.

*Id.* at 2620.

This court has already given its reasons in *Teleservices*[11] why it believes that *Stern*'s implications are much broader – that the due process concerns it raised requires that the remainder of what 28 U.S.C. § 157(b)(2) delineates as a bankruptcy judge's core authority must also be tested. However, other courts have declined, preferring Trustee's reading of *Stern* instead.

The Narrow Interpretation

*Direct Response*[12] has labeled this supposedly more conservative approach as the "Narrow Interpretation." As *Direct Response* explained:

> The Court [sic] must honor the Chief Justice's express limitations and assurances regarding the narrowness of the minimal breadth of the

---

[11]*Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 456 B.R. 318 (Bankr. W.D. Mich. 2011).

[12]*Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 2012 WL 112503, at *5 (Bankr. D. Del. 2012).

decision. Those express limitations define the narrow reach of the decision and cannot be simply disregarded as *dicta*.

*Direct Response*, 2012 WL 112503, at *8 (footnote omitted).[13]

However, with that said, *Direct Response* also concedes that *Stern* is not necessarily the Supreme Court's last word on the subject. "Arguably, the constitutional validity of the bankruptcy courts' entire decision making authority may still be in question . . . ." *Id.* at *27 n.11. It seems better, then, to describe the Narrow Interpretation as more cautionary than absolute. In other words, those adopting the Narrow Interpretation are not saying that the rest of 28 U.S.C. § 157(b)(2) is constitutionally sound. Rather, they simply would prefer to maintain the status quo until the Court once again declares otherwise. The question, though, is whether the Constitution itself permits the lower courts this luxury.

Due Process

*Stern* is a long opinion, with the limiting language that has been so heavily relied upon appearing only in its last few paragraphs. However, even before going into its complicated history – indeed, at the very outset of the opinion – Justice Roberts made it very clear that resolution of Vicki's and her stepson's dispute ultimately turned on "very basic principles" – to wit, Article III, § 1 of the Constitution.[14] The Chief Justice likewise began the constitutional portion of his analysis

---

[13]*See also Safety Harbor*, 456 B.R. at 705; *In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-16 (Bankr. S.D.N.Y. 2011); *Heller Ehrman, LLP v. Arnold & Porter, LLP (In re Heller Ehrman, LLP)*, 2011 WL 4542512, at *4-5 (Bankr. N.D. Cal. 2011); *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011).

[14]The full quote is:

Although the history of this litigation is complicated, its resolution ultimately turns on very basic principles. Article III, § 1, of the Constitution commands that "[t]he judicial Power of the United

6

by laying out exactly why Vicki's counterclaim raised Article III issues. "As its text and our precedent confirm, Article III is 'an inseparable element of the constitutional system of checks and balances' that 'both defines the power and protects the independence of the Judicial Branch.'" *Id.* at 2608 (citing *Northern Pipeline*, 458 U.S. at 58, 102 S. Ct. 2858 (plurality opinion)).

The Framers, he continued, "considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'" *Id.*[15]   The Framers themselves had experienced firsthand how George III had manipulated judges serving under him with threats to their livelihood.

---

States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." That Article further provides that the judges of those courts shall hold their offices during good behavior, without diminution of salary. *Ibid.* Those requirements of Article III were not honored here.

*Stern*, 131 S. Ct. at 2600-01.

[15]   As Hamilton put it, quoting Montesquieu, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'"

*Stern*, 131 S. Ct. at 2608 (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton) (quoting 1 Montesquieu, Spirit of Laws 181)).

7

*Cf.* THE DECLARATION OF INDEPENDENCE.[16]   Therefore, including Article III was an absolute

necessity if true liberty was to be had.

> By appointing judges to serve without term limits, and restricting the
> ability of the other branches to remove judges or diminish their
> salaries, the Framers sought to ensure that each judicial decision
> would be rendered, not with an eye toward currying favor with
> Congress or the Executive, but rather with the "[c]lear heads ... and
> honest hearts" deemed "essential to good judges."

*Stern*, 131 S. Ct. at 2609 (citing 1 Works of James Wilson 363 (J. Andrews ed. 1896)).

   *Stern*'s majority and the dissent certainly disagreed as to how Article III was to be applied

in that instance.  However, all seemed to agree with the Chief Justice that Article III's purpose was

to protect life and property through an independent judiciary.  Nor is it likely that any would have

disagreed had Justice Roberts added that Article III is simply a reflection of another constitutional

principle held even dearer – the Fifth Amendment's guaranty of due process.  After all, a unanimous

Court had agreed only a week earlier that "[t]he structural principles secured by the separation of

powers protect the individual as well."[17]

---

[16]   The history of the present King of Great Britain is a history of
repeated injuries and usurpations, all having in direct object the
establishment of an absolute Tyranny over these States. To prove this
let Facts be submitted to a candid world.

* * *

He has made Judges dependent on his Will alone, for the tenure of
their offices, and the amount and payment of their salaries.

THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

[17]*Bond v. U.S.*, _____ U.S. _____, 131 S. Ct. 2355, 2356 (2011)).

8

It is equally noteworthy that *Murray's Lessee*,[18] which figures prominently in both *Stern* and *Northern Pipeline*, is actually a due process case. The appellant argued there that the Department of Treasury had violated the separation of powers when it seized and sold a custom agent's assets for unremitted duties without the involvement of an Article III judge. The Court, though, declared that the question was best considered by making a different inquiry:

> [Whether] the effect of the proceedings authorized by the act in question is to deprive the party, against whom the warrant issues, of his liberty and property, 'without due process of law;' and, therefore, **is in conflict with the fifth article of the amendments of the constitution.**

*Murray's Lessee*, 59 U.S. at 275 (emphasis added).

In sum, *Stern* is ultimately about due process. In other words, was Pierce afforded his Fifth Amendment rights when a federal judge other than one appointed under Article III entered a judgment that authorized over $400 million dollars to be taken from him? Of course, Koloseik stands to lose much less here. Nonetheless, a taking of property is still involved.

Gravity

It is helpful at this point to consider how a different discipline would approach a similar problem. Physics also involves finding answers through the application of basic principles. For example, Newton applied one of nature's own fundamental laws – gravity – to answer his questions about a falling apple. But gravity does not affect just ripened apples. It is pervasive. Consequently, if a physicist were to ask himself "What would happen if I were to step off a cliff?" he might for a brief moment contemplate the possibility of floating. However, he would just as quickly choose dropping like a rock as the only answer because the law of gravity permits no other.

---

[18]*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272 (1856).

Now consider *Stern*. Was Justice Roberts' approach that different? In effect, the Court was confronted with two possibilities – either the bankruptcy court had the constitutional authority to enter the judgment against Pierce or it did not. Likewise, the Court tested both possibilities against what is the constitutional equivalent of gravity – due process. And having applied that test, the Court concluded that fundamental due process entitled Pierce to the independent oversight of an Article III judge.

Why, then, would the Chief Justice not want the lower courts to engage in the same type of process when other aspects of 28 U.S.C. § 157(b) must be examined? After all, testing hypotheses is what courts do. And, like physics, there are principles that must be followed. Granted, it is easier to ignore a constitutional principle than it is to ignore gravity. On the other hand, federal judges, unlike their scientific counterparts, are under oath to uphold the Constitution. *Cf.* 28 U.S.C. § 453. As such, all lower courts are duty-bound to consider how its guaranty of due process might affect an outcome no matter the circumstance.

*Stern* is without question a narrow ruling. It tested only one aspect of a bankruptcy judge's broad authority under 28 U.S.C. § 157 and then only in the context of a state law claim. *Stern* is also binding, as will be the Court's next decision should it ever again address this controversial issue. However, with all due respect, *Stern* cannot stand as a roadblock to further inquiry no matter what the Chief Justice and the other three justices who joined him have suggested.[19] The lower courts can

---

[19]Although Justice Scalia joined with Chief Justice Roberts and Justices Alito, Thomas, and Kennedy to create a majority in the decision, it is clear from his concurrence that he did not share the others' view that the constitutional issue was a narrow one limited to only the bankruptcy court's inability to adjudicate state law claims and counterclaims. Quite to the contrary, Justice Scalia stated that "Article III gives no indication that state-law claims have preferential entitlement to an Article III judge" and that "in my view an Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary." *Stern*, 131 S. Ct. at 2621 (emphasis

10

no more ignore the effect of due process upon their work than can physicists ignore gravity's effect upon theirs.

The Public Rights Exception

In fairness, the Narrow Interpretation is not so much an abdication of a court's duty to apply due process principles as it is an acknowledgment that the Court itself has created an exception that must also be taken into account. The exception is based upon a distinction between "private rights" and "public rights." Justice Scalia maintains that the exception is dangerous because it encroaches upon what is best described as "Article III due process."[20] Nonetheless, the exception has grown, especially in the area of administrative law.

Ironically, *Murray's Lessee* is also the seminal case for this exception.[21] However, the discussion there was more about "public wrongs" than "public rights.[22] Moreover, the exception to

_____

in original). Therefore, it is more accurate to ascribe this portion of *Stern* to only a plurality of the Chief Justice and the other three.

[20]*Cf. Stern*, 131 S. Ct. at 2621 (Scalia, J. concurring).

[21]*See, e.g., id.* at 2611.

[22]As more thoroughly explained in *Teleservices*, 456 B.R. at 328-31, the so-called "public rights" exception came up in *Murray's Lessee* only after the Court had completed its due process analysis and only then because the appellant had suggested the illogic of Congress having still assigned to the judiciary something that it had the ability to do itself:

> In short, the argument is, that if this were not, in its nature, a judicial controversy, congress could not have conferred on the district court power to determine it upon a bill filed by the collector. If it be such a controversy, then it is subject to the judicial power alone; and the fact that congress has enabled the district court to pass upon it, is conclusive evidence that it is a judicial controversy.

*Murray's Lessee*, 59 U.S. at 282.

11

Article III due process that *Murray's Lessee* recognized was small.  The only question there was whether the Department of Treasury had violated the tax collector's Fifth Amendment rights through its extra-judicial seizure of his property.  *Murray's Lessee* certainly recognized as a general proposition that Fifth Amendment due process requires an Article III judge whenever a taking like the one involved there had occurred.  However, the Court determined as well that the concept of due process had historically allowed for the sovereign to hold its own agents accountable for uncollected taxes without a judge's involvement.  Therefore, it concluded that the challenged seizure was not invalid.

Indeed, if only *Murray's Lessee* controlled, what has now become known as the public rights exception would be confined to the narrow historical one that Justice Scalia continues to advocate.  However, seventy-five years later, the Court began to expand upon *Murray's Lessee*'s recognition that Congress could act extrajudicially without being in violation of the Fifth Amendment's guaranty of due process.  Again, *Murray's Lessee* allowed Congress to empower the treasury to engage in judge-like activities – the collection of debt – because Congress had its own authority under the Constitution to collect taxes and there was an historical exception to Article III-type due process for the sovereign's rights in that instance.  It was inevitable, then, that the Court would be eventually asked whether other exercises of Congress' power – i.e., its exercise under Article I of other so-called "public rights" – might also include extrajudicial proceedings that could survive Fifth Amendment and Article III scrutiny.

---

The Court, though, dismissed the argument by comparing a private wrong with a public wrong.  A wrong done by a private citizen, it said, could be redressed by the courts.  However, the same was not true when a sovereign itself was in the wrong.  In that case, the sovereign and those acting on its behalf were immune from a court's authority unless the sovereign itself had consented to the court's jurisdiction.  *Id.* at 284.

12

The first of these cases is *Crowell v. Benson*.[23] It involved the enforcement of a commissioner's award for injuries an individual suffered while employed on navigable waters. The Court found that Congress' power to alter and revise the maritime laws certainly gave it the authority to address employment-related injuries on rivers and the high seas. *Id.* at 39-42, 52 S. Ct. at 287-89. As for the employer's due process rights, it noted that the matter before it was one of "private right, that is, of the liability of one individual to another under the law as defined."[24] Nonetheless, the Court determined that the employer had not been denied due process because only the commissioner's findings of fact were binding. Otherwise, the decision whether to enter a judgment remained with the district's Article III judge. As such, the Court in *Crowell* found little difference between the commissioner's role in that process and a jury's role or a special master's role in matters actually under an Article III judge's full purview.[25]

Indeed, a full blown "public rights" exception to Article III-type due process did not emerge until the 1970s and 1980s with the decisions of *Atlas Roofing*[26] and *Thomas*.[27] The former upheld the assessment of OSHA civil penalties by an administrative agency without a jury trial and the latter

---

[23]*Crowell v. Benson*, 285 U.S. 22, 52 S. Ct. 285 (1932).

[24]*Crowell*, 285 U.S. at 51, 52 S. Ct. at 292.

[25]The Court also observed that the commissioner's fact-finding authority did not go so far as to give finality to such fundamental questions as whether the injury had occurred on navigable waters or whether there was the requisite master-servant relationship. The district court, it said, should still determine those questions "upon its own record and the facts elicited before it." *Crowell*, 285 U.S. at 64, 52 S. Ct. at 297.

[26]*Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 97 S. Ct. 1261 (1977).

[27]*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 105 S. Ct. 3325 (1985).

permitted Congress' selection of binding arbitration as the exclusive means for resolving disputes

under a federally regulated pesticide program. And shortly thereafter, the Court in *Schor*[28] accepted

with very little comment a congressionally created commission's ability to award reparations to a

customer on account of a commodity broker's fraudulent activities. *Schor*, 478 U.S. at 853-54, 106

S. Ct. at 3258-59. *Schor's* focus was instead upon whether that same commission also had the

authority to entertain the brokerage firm's state law counterclaim. *Id.* at 855-59, 106 S. Ct. at 3259-

61.

The question, of course, is how much further can this exception be stretched. As *Crowell*

itself observed, there must be a limit. Otherwise, Congress could easily replace Article III judges

with its own set of bureaucrats.

> The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use, and that the Congress could completely oust the courts of all determinations of fact by vesting the authority to make them with finality in its own instrumentalities or in the executive department. **That would be to sap the judicial power as it exists under the federal Constitution, and to establish a government of a bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts becomes in effect finality in law.**

*Crowell*, 285 U.S. at 56-57, 52 S. Ct. at 295 (emphasis added).

Some of my colleagues have already decided that the bankruptcy system is a "public right."

However, many have done so with little explanation[29] and certainly with not much guidance from

---

[28]*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S. Ct. 3245 (1986).

[29]*See, e.g., Pusser's (2001) Ltd. v. HMX, LLC*, 2012 WL 1068756, at *6 (N.D. Ill. 2012); *Williams v. Laughlin (In re Laughlin)*, 2012 WL 1014754, at *8 (Bankr. S.D. Tex. 2012). One case

the Court. Not only did *Stern* decline the invitation to elaborate upon the exception's further reach;[30] *Stern* actually described the exception as "amorphous,"[31] and the Court's earlier efforts at defining it as not being "entirely consistent."[32] Indeed, it is the Court's refusal in both *Stern* and *Northern Pipeline* to allow a bankruptcy court to do everything that Congress might like that stands as a clear indication that the Court will never declare bankruptcy a "public right" that simply overrides Article III and the due process it affords. And if not all of bankruptcy is a "public right," it is difficult to understand how some portions of it might be while others are not.

However, what gives this court more pause is the seriousness of the constitutional issue involved. After all, only *Stern*'s four dissenting justices believed that due process had not been compromised when someone other than an Article III judge entered the judgment against Pierce

---

that does offer an explanation is *West v. Freedom Med., Inc. (In re Apex Long Term Acute Care-Katy, L.P.)*, 465 B.R. 452 (Bankr. S.D. Tex. 2011). In fact, *Apex* may serve as a roadmap for the Supreme Court should it ever be inclined to apply that exception generally to the administration of the bankruptcy laws. This court would note, though, that *Apex* does have its problems. For example, *Apex* does not explain why the bankruptcy line should be drawn with preferences on the public side and fraudulent transfers/state law claims on the other. Is this aspect of the bankruptcy process any more a public right than the collection of a receivable, which is certainly another crucial aspect of the process? Or, to put it differently, why is the recipient of a million dollar preference not entitled to the same protection of an Article III judge as the guy who owes the estate $20 on an open account? And finally, if the distinction is to rest upon the notion that preferences are traditional bankruptcy functions whereas the enforcement of state law claims are not, it is important to remember that the vast majority of the bankruptcy cases filed today are voluntary and that the voluntary side of the current bankruptcy laws finds its roots in the same common law courts that were adjudicating the collection of receivables and the recovery of torts. *Cf. Teleservices*, 456 B.R. at 327 (observing that voluntary bankruptcy cases were first heard by common law courts as creditor arrangements).

[30]*Stern*, 131 S. Ct. at 2614 n.7. *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 n.11, 109 S. Ct. 2782, 2798 n.11 (1989).

[31]*Stern*, 131 S. Ct. at 2615.

[32]*Stern*, 131 S. Ct. at 2611.

15

Marshall. As for the plurality and Justice Scalia, they all expressed the same concern as the one expressed in *Crowell* before – that fundamental constitutional issues were at stake, with the risk of the long recognized protections of an independent federal judiciary being swallowed up by this ill-defined exception.

> What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. **If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.**

*Stern*, 131 S. Ct. at 2615 (emphasis added).

To then rush in at this time and declare the bankruptcy system a "public right" seems to this court imprudent. It is better instead to tread cautiously, appreciating all along that 28 U.S.C. § 157(b)(2) threatens the Constitution whenever it permits the taking of property through a non-Article III tribunal's entry of a final judgment. Indeed, *Stern* offers at least this much guidance regarding the public rights exception – that when statutes like 28 U.S.C. § 157(b)(2) come into conflict with the Fifth Amendment's guaranty of due process, the presumption is in favor of the matter's disposition through an Article III judge.[33] It should be equally apparent that my colleagues and I are the ones who ostensibly gain if this particular encroachment upon Article III is allowed. Therefore, is it not more appropriate for the Article III courts to decide this issue themselves? It is, after all, the

---

[33]*Stern*, 131 S. Ct. at 2618; *Northern Pipeline*, 458 U.S. at 69, n.23 (citations omitted).

16

independence they enjoy and that this court does not that guarantees the fair and unbiased consideration of the fundamental constitutional principles that 28 U.S.C. § 157 raises.[34]

The Sky Has Not Fallen

The implicit, if not explicit, fear of many courts is that the bankruptcy system will be severely impaired unless *Stern* is narrowly construed or the public rights exception is liberally applied.[35] However, this court does not share that alarm. Rather, I concluded in *Teleservices* that many of the core aspects of the bankruptcy process do not even require the invocation of a "public right" exception because no unconstitutional taking of property is at risk. For example, no Article III judge is needed when the debtor has voluntarily turned over his property and the question is simply (1) whether the trustee should now be authorized to sell that property; or (2) which of the estate's creditors will be paid and which will not. *Teleservices*, 456 B.R. at 333-34. Similarly, decisions regarding enforcement of and exceptions to the automatic stay and discharge injunction are not within the "judicial power" that Article III defines. *Id.* at 335-36.

Therefore, I do not agree with Trustee when he says that *Teleservices* "eviscerated the ability of the bankruptcy court to enter final judgments in most matters adjudicated under the core/non core

---

[34]How the various Article III courts will sort this out among themselves is impossible to say. Suffice it for purposes here that the Supreme Court's and the Sixth Circuit's views will control if either comes to a different conclusion than I.

[35]*See, e.g., BankUnited Fin. Corp. v. FDIC (In re BankUnited Fin. Corp.)*, 462 B.R. 885, 2011 WL 5884925, at *3 (Bankr. S.D. Fla. 2011) ("Since its release, a maelstrom of opinions and articles have been written about the scope of Stern, ranging in tone from "much ado about nothing" to "the end of the bankruptcy world as we know it."); *Gugino v. Canyon Co. (In re Bujak)*, 2011 WL 5326038, at *2 (Bankr. D. Idaho 2011) ("Despite what the majority actually said in *Stern*, some insist that the decision foretells a jurisdictional Armageddon for the bankruptcy courts.").

17

dichotomy . . . ."[36]  Moreover, to the extent some aspects of the bankruptcy process requires *Crowell*'s more pragmatic approach,[37] I am confident that the Article III courts will find the appropriate device – whether it be a limited public rights exception or something else – as the need is presented.  But until that issue is finally resolved, I will comply with *Stern*'s direction that I conform all aspects of my authority with the Constitution no matter what 28 U.S.C. § 157(b) might otherwise provide.[38]

Section 542

As already noted, Trustee claims that his effort to recover the account due from Koloseik is different than those in *Stern* and *Northern Pipeline* because he is acting under the authority of Section 542(b).  However, Congress can no more accomplish through Title 11 what *Stern* said it could not through Title 28.  The Constitution will have been transgressed just the same.

Indeed, Trustee's argument illustrates the danger of relying upon superficial distinctions to sidestep the basic constitutional principles that both *Stern* and *Northern Pipeline* said were so important.[39]  Trustee is absolutely correct that Koloseik is indebted to the estate and that he should

---

[36]*See* Pl.'s Supp. Br. in Support of its Mo. for Entry of Default Judgment, 4, Dec. 16, 2011 (DN 20).

[37]*Crowell*, 285 U.S. at 64, 52 S. Ct. at 297.

[38]For example, 28 U.S.C. § 157(b)(2) at the very least implies that the bankruptcy court is to decide whether an order for relief is to be entered when an involuntary petition has been filed. However, the taking of property that such a process inevitably involves certainly would seem to raise due process and Article III concerns.  Application of an historic "public rights" exception there might be one way of solving the apparent conflict.

[39]Cartoons illustrate this point well.  It is always tempting to believe that Wile E. Coyote would have remained suspended in air indefinitely had only Road Runner refrained from handing him that Acme anvil.  However, the law of gravity quickly tells us that the anvil had nothing to do with Coyote's fate.

be compelled to pay over what he owes. However, neither of these facts is an acceptable excuse for ignoring the Constitution. To the contrary, they underscore exactly why it comes into play. Put simply, Trustee wants an order through which he can force Koloseik to part with his money. Koloseik's resistence to its enforcement could even land him in jail. Therefore, this court has no choice but to ask "Does this court have the constitutional authority to issue such an order on its own?" Or does the Fifth Amendment's guaranty of due process require the oversight of an independent Article III judge before that order may enter?[40]

Default Judgment

Although Trustee has not made the argument, Koloseik's default raises the issue of waiver as well. *Cf. Hagan v. Classic Prods. Corp. (In re Wilderness Crossings, LLC)*, 2011 WL 5417098 (Bankr. W.D. Mich. 2011). *Wilderness Crossings* was also a core proceeding, albeit it involved the avoidance and recovery of a preference. And like Koloseik, the defendant there had not answered the trustee's complaint. Consequently, the bankruptcy court was asked to enter a default judgment.

*Wilderness Crossings* concluded that a judgment could enter, *Stern* notwithstanding. *Id.* at *2. Foremost in that court's decision was *Stern*'s own acknowledgment that 28 U.S.C. § 157(b)(2) is not jurisdictional. *Id.* at *1. Therefore, the court reasoned that the issues *Stern* raised, albeit constitutional, could be waived. *Id.* The court also took into account the debtor's default as constituting an admission to all the operative facts. *Id.* at *2

---

[40]In *In re Ambec Financial Group, Inc.*, the court commented at the end that *Stern* "has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court." 457 B.R. 299, 308 (Bankr. S.D.N.Y. 2011). But the same can be said of those who, for whatever strategic or tactical reason, intone the plurality's "one isolated respect" remark as justification for having the bankruptcy court hear a matter notwithstanding the constitutional issues involved.

The federal rules certainly permit judgments to enter against a person when he fails to respond to a complaint. FED. R. BANKR. P. 7055, FED. R. CIV. P. 55. However, apart from claims for a sum certain, the judge must still decide whether entry is appropriate. FED. R. BANKR. P. 7055(2), FED. R. CIV. P. 55(2). Nor is the judge obligated to accept the plaintiff's complaint at face in making that decision. For instance, it is fair to say that a default judgment would not enter if the tort claimed was based solely upon moral indignation. But if that is so, then is not the court's own authority to enter the judgment something else that should be considered? Or does Koloseik's default somehow eliminate the Article III due process that both *Stern* and *Northern Pipeline* otherwise require?

This court has already determined that a party may consent to the bankruptcy court's entry of a final judgment even when the authority is otherwise lacking.[41] The logic is simple enough. Congress has largely removed an Article III judge from adjudications otherwise subject to his oversight if the parties have agreed to binding arbitration. 9 U.S.C. §§ 1, *et seq.* It would certainly seem, then, that parties could agree to a bankruptcy court hearing a matter without violating Article III due process if, as is the case here, the district court has chosen to incorporate such a procedure through its local rules.[42]

---

[41]*Teleservices*, 456 B.R. at 338. *See also Schor*, 478 U.S. at 849, 106 S. Ct. at 3255 ("Indeed, the relevance of concepts of waiver to Article III challenges is demonstrated by our decision in *Northern Pipeline*, in which the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication."); and *Thomas*, 473 U.S. at 591, 105 S. Ct. at 3338 ("The danger of Congress or the Executive encroaching on the Article III judicial powers is at a minimum when no unwilling defendant is subjected to judicial enforcement power as a result of the agency 'adjudication.'").

[42]*Cf.* 28 U.S.C. § 157(a) and W.D. Mich. LCivR 83.2.

20

Waiver is in fact synonymous with consent. It ordinarily means "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938).[43] Of course, consent can be implied from "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* However, those facts and circumstances must still indicate that an intelligent decision to waive the right had been made. *Id.*

But a waiver, whether by actual consent or by implication, is not the same as a forfeiture. *Olano*, 507 U.S. at 733, 113 S. Ct. at 1777 ("Waiver is different from forfeiture"). Whereas waiver implies intent, forfeiture is simply "the failure to make the timely assertion of a right." *Id.* It is unfortunate, then, that the two terms are used interchangeably.

> Along with the Second Circuit, I believe that the term "forfeiture" is a more accurate description of a defendant's loss of the right to challenge personal jurisdiction, but I will use the term "waiver" in the remainder of this opinion, consistent with our circuit's established practice."[44]

Has, then, Koloseik consented to a judgment being entered against him by this court? Of course not. Koloseik has not even filed an answer. Nor can waiver be implied through Koloseik's behavior. Granted, his failure to appear permits the inference that he is indifferent. However, indifference alone is not enough to establish the "intelligent waiver" that *Johnson* had in mind.

---

[43]*See also U.S. v. Graham*, 622 F.3d 445, 455 n.9 (6th Cir. 2010) (quoting *U.S. v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770 (1993)); *In re Roberts*, 249 B.R. 152, 154-55 (Bankr. W.D. Mich. 2000) (holding that a lienholder's failure to object cannot be equated with the affirmative consent that 11 U.S.C. § 3636(f)(2) requires.).

[44]*Gerber v. Riordan*, 649 F.3d 514, 522 n.1 (6th Cir. 2011) (Moore, J., concurring).

21

Therefore, if Koloseik has lost his right to an Article III judge's oversight, it is only because he has forfeited it.

Defendants can lose their right to an Article III adjudication if they wait too long to assert it. For example, in *Men's Sportswear*,[45] the Second Circuit refused to consider the appellant's objection to the bankruptcy court's entry of the judgment, noting that he had remained silent before both lower courts despite multiple opportunities to assert his right.[46] Nonetheless, declaring a forfeiture is a serious matter that requires restraint. As the Court observed in *Johnson*, "'courts indulge every reasonable presumption against waiver' of fundamental rights" and "we 'do not presume acquiescence in the loss of fundamental rights.'" 304 U.S. at 464, 58 S. Ct. at 1023 (citations omitted).

With this in mind, this court cannot find Koloseik to have forfeited his right to Article III due process either. He has neither been dilatory nor has he engaged in the type of sandbagging that the Court itself spoke of in *Stern*.[47] Koloseik simply did not respond when he was served the complaint. If his consent cannot be implied from this single failure, then punishing him for it is equally out of the question.[48]

---

[45] *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134 (2nd Cir. 1987).

[46] *Id.* at 1137-38. *See also McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1337 (5th Cir. 1995); *Cain P'ship, Ltd. v. Pioneer Inv. Serv's. Co. (In re Pioneer Inv. Serv's. Co.)*, 946 F.2d 445, 449 (6th Cir. 1991).

[47] 131 S. Ct. at 2608.

[48] The court recognizes that Koloseik has not truly forfeited his rights since the judgment could be set aside at his request. FED. R. BANKR. P. 7055 and FED. R. CIV. P. 55(c). However, setting aside the judgment is not guaranteed. Rather, it would be conditioned upon him meeting one of the conditions of FED. R. CIV. P. 60(b). *Id.*

Therefore, this court will not follow *Wilderness Crossings*. Koloseik did not consent to, waive, or forfeit his right to have an Article III judge review this matter before judgment is against entered against him.

Civil Rule 55(b)(1)

FED. R. CIV. P. 55(b)(1), which is incorporated into FED. R. BANKR. P. 7055, does, though, present a conundrum. It provides that:

> If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk--on the plaintiff's request, with an affidavit showing the amount due--must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

---

Moreover, rationalizing entering the judgment on this basis begs the question of why Koloseik should even have to ask. After all, the issue here is one of authority. Again, Koloseik could have given this court the authority to enter judgment against him through his consent, either expressed or implied. That authority could have also been gained at some later date through forfeiture. However, Koloseik's only fault here is that he has not articulated in an answer what *Stern* has already made apparent – that this court is constitutionally incapable of entering the judgment Trustee seeks. How, then, can Koloseik's silence alone confer upon this court the authority it otherwise clearly lacks?

Nor is it appropriate to compare the right to Article III due process with other constitutional rights that Koloseik has also lost. For example, Koloseik's default means that judgment will be entered against him without a jury trial even through he clearly had the right to one under the Seventh Amendment. But then again, summary judgment also denies the losing party his right to a jury trial. The point is that in neither instance has the party's right to a jury trial actually been lost. Rather, the court, in granting either motion, has simply determined that there are no factual issues for a jury to decide. Indeed, the only real difference between the two motions is that a party who opposes summary judgment may argue that there are genuine issues of fact whereas a defendant who has defaulted is effectively barred by his default from challenging the facts alleged.

23

Should not this court, then, have the same authority given that Trustee here seeks a sum certain –

$1,850.59 – against Koloseik?  Indeed, at least one bankruptcy court has already come to this

conclusion.[49]

Frankly, the question is a good one,  for it asks whether the principles *Stern* espouses are

being taken too far.  *Refco, Inc.*[50] well illustrates this concern:

> In that context, and consistent with Justice Breyer's observations in *Stern*, albeit in dissent, 131 S.Ct. at 2626–7, it seems rather far-fetched that the fact that the Second Circuit appointed this Court for a 14 year term, renewable by the Second Circuit, and that the Court's salary and benefits are tied only by statute to the district courts' salary and benefits would raise such profound separation-of-powers and liberty questions as to overturn Congress' post- *Marathon* intent and ample precedent, although perhaps this point is better addressed by an Article III court free from any imputation of bias. See Linda L. Coco, "Stigma, Prestige and the Cultural Context of Debt: A Critical Analysis of the Bankruptcy Judge's Non–Article III Status," 16 Mich. J. Race & L. 181, 231–32 (2011). It would appear that a more direct affront to Article III would be the imposition by Congress of such restraints on the bankruptcy courts that their workload was imposed on the district courts.

*Id.* at 192 n.9.

However, the majority in *Stern* rejected such pragmatism for a much stricter approach that requires

application of the constitutional principles involved to "the mundane as well as the glamorous."[51]

As such, it seems the better question is whether *Stern* also casts doubt upon FED. R. CIV. P. 55(b)(1).

---

[49] *White v. Pugh (In re Butler Innovative Solutions)*, 2011 WL 4628746, at *1 (Bankr. D. D.C. 2011).

[50] *Kirschner v. Agoglia (In re Refco Inc.)*, 461 B.R. 181 (Bankr. S.D.N.Y. 2011).

[51] 131 S. Ct. at 2609.

24

According to *Wright, Miller & Kane*, FED. R. CIV. P. 55 finds its roots in both equity and the common law, with the former permitting decrees *pro confesso* and the latter *nil dicit* judgments.[52] Each of these in turn were premised upon the pleadings themselves. That is, the defaulting party, by failing to answer, would be deemed under the common law or in equity to have admitted all of the allegations and to have otherwise waived any defect in pleading. Therefore, all that was left for those courts to do regarding judgment was to affirm their jurisdiction.[53]

The problem, of course, is that *Stern* is based upon constitutional principles, not upon the common law or equity. In other words, *Stern* addresses how the law, whatever it might be, is to be enforced at the federal level. *Stern* also reflects the Court's concerns about an individual's rights and the due process the Fifth Amendment guarantees. And finally, at least a majority in *Stern* concluded that the "amorphous" public rights exception did not extend so far as to permit an automatic override to Article III due process whenever a bankruptcy proceeding is involved.

Apparently, FED. R. CIV. P. 55(b)(1) was adopted in order to "reliev[e] the judge of some of his less complicated functions . . . ."[54] However, it is difficult to see how matters involving a sum certain are so routine as to be automatically excepted from an Article III judge's scrutiny. Is not the risk of an unjust seizure of another's property just the same? Indeed, the whole point of *Stern* is that convenience cannot substitute for the constitutional principles that both the separation of powers and due process stand for. Therefore, until it is decided otherwise, this court will decline to find in FED.

---

[52]*Wright, Miller & Kane*, Fed. Practice and Proc.: Civil 3d § 2681. *See also Thomson v. Wooster*, 114 U.S. 104, 111, 5 S. Ct. 788, 791 (1885).

[53]*Wright, Miller & Kane* § 2681.

[54]*U.S. v. Herlong*, 9 F.R.D. 194, 196 (D. S.C. 1949).

25

R. Civ. P. 55(b)(1) authority to enter judgments when *Stern* makes it quite clear that more than convenience is at stake when the taking of another's property is involved.

## CONCLUSION

For the reasons given, no default judgment will enter.  Rather, this court will prepare a report and recommendation to the district court for it to enter a judgment in the requested amount, together with costs.[55]

_____   4/23/12

Hon. Jeffrey R. Hughes
United States Bankruptcy Judge

Signed this 27th day of April, 2012
at Grand Rapids, Michigan.

---

[55]*Samson v. Blixseth (In re Blixseth)*, 2011 WL 3274042 (Bankr. D. Mont. 2011) holds that a bankruptcy judge lacks even the authority to submit proposed findings of fact and law in those instances where the Constitution vacates the court's core authority.  2011 WL 3274042, at *12. However, even if one assumes that *Blixseth* is technically correct, the district court itself has jurisdiction in this bankruptcy case and that jurisdiction includes the authority under Section 105(a) to "issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  If, then, 28 U.S.C. § 157 itself does not give this court authority to issue proposed findings of fact and law, it certainly stands to reason that the district court itself can permit it as a Section 105(a) procedure, especially when (1) Congress has allowed the same procedure in the case of non-core matters; (2) Congress likely did not envision the problem *Stern* creates when it fashioned 28 U.S.C. § 157; and (3) Congress certainly did not intend the stalemate that *Blixseth*'s interpretation suggests. Of course, if the district court disagrees regarding the availability of Section 105(a) to correct the problem, the district court can simply disregard the report and recommendation and proceed as it sees fit.

26